## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ROBERT BAKER III,**

*Plaintiff,*

Case No.: 8:24-cv-00434-TPB-CPT

v.

**EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., FAIR ISAAC CORPORATION,** *and* **TRANS UNION LLC,**

*Defendants.*

_____/

## FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, Robert Baker III ("Plaintiff" or "Mr. Baker"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), Fair Isaac Corporation ("Fair Isaac"), and Trans Union LLC ("Trans Union") (collectively, the "Defendants"), stating as follows:

## PRELIMINARY STATEMENT

1.      This is an action for violations of the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et seq.* ("FCRA") by Equifax, Experian and Trans Union, and for defamation and negligence by Fair Isaac.

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction for Plaintiff's FCRA claims arises under 28 U.S.C. § 1331, as the FCRA is a federal statute.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

4.      The Defendants are subject to the jurisdiction of this Court pursuant to § 48.193, Fla. Stat. and Fed. R. Civ. P. 4(k).

5.      Venue is proper in the Middle District of Florida because the acts complained of were committed and/or caused by the Defendants in Polk County, which is within the Middle District of Florida.

## PARTIES

6.      **Mr. Baker** is a natural person residing in the City of Auburndale, Polk County, Florida.

7.      Mr. Baker is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

8.      **Equifax** is a Georgia limited liability company with a principal business address of 1550 Peachtree Street NW, Atlanta, GA 30309.

9.      Equifax is registered to conduct business in the State of Florida, where its Registered Agent is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

10.    **Experian** is an Ohio corporation with a principal business address of 475 Anton Boulevard, Costa Mesa, CA 92626.

11.    Experian is registered to conduct business in the State of Florida, where its Registered Agent is CT Corporation Service, 1200 South Pine Island Rd., Plantation, FL 33324.

12.    **Trans Union** is a Delaware limited liability company with a principal business address of 1550 Peachtree Street NW, Atlanta, GA 30309.

13.    Trans Union is registered to conduct business in the State of Florida, where its Registered Agent is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

14.    Equifax, Experian, and Trans Union (collectively, the "CRAs") are each a "consumer reporting agency" ("CRA") within the meaning of 15 U.S.C. § 1681a(f), in that, for monetary fees, dues, and/or on a cooperative nonprofit basis, they regularly engage, in whole or in part, in the practice of assembling or evaluating consumer credit information, or other information on consumers, for the purpose of furnishing consumer reports to third parties, and use means or facilities of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically the mail and internet.

15.    **Fair Isaac** is a Delaware corporation with a principal business address of 5 West Mendenhall, Ste 105, Bozeman, MT 59715.

16.     Fair Isaac is registered to conduct business in the State of Florida, where its Registered Agent is Corporation Service Company, 121 Hays St., Tallahassee, FL 32301.

## GENERAL ALLEGATIONS

17.     Fair Isaac is a data analytics company which, for all intents and purposes, created the first widely-used, general purpose credit score in the United States, in 1989.

18.     Since 1989, Fair Isaac's FICO® scores have become almost synonymous with the words "credit score," similar to how "Kleenex®" is commonly used to refer to any brand of tissue.

19.     The 300 to 850 score range utilized in many FICO® score versions is essentially the base of reference in most American's minds in terms of how a credit score evaluates a consumer. (Certain "industry specific" FICO® scores range from 250 to 900, whereas general-purpose scores range 300-850.)

20.     Equifax, Experian, and Trans Union each have an agreement with Fair Isaac whereby they license software created by Fair Isaac.

21.     Then, when an end user requests a FICO® score concerning a consumer, Equifax, Experian, and Trans Union input tradeline data they maintain on the consumer in his or her credit file into the software provided by Fair Isaac, which generates the consumer's FICO® score.

22.    Equifax, Experian, and Trans Union each charge their customers for FICO® scores and retain at least a portion of that revenue for themselves.

23.    When Fair Isaac's software generates a score, the software also provides the four most significant key factors as to why that consumer's score was not higher.

24.    These factors are included, along with the numerical FICO® score, by Equifax, Experian, and Trans Union in the report sold by each to the end user.

25.    While Equifax, Experian, and Trans Union provide the data to input into Fair Isaac's software, Fair Isaac alone sets the parameters by which a FICO® score is generated.

26.    The actual scoring formula remains in sole control of Fair Isaac – neither Equifax, Experian, nor Trans Union has any ability to alter how a FICO® score is calculated.

### CRAs and Fair Isaac Falsely Claim Mr. Baker Has No Credit Card History

27.    Since at least June 2016, Mr. Baker has been an authorized user on his parent's American Express charge account, which was opened in April 1985. **SEE PLAINTIFF'S EXHIBIT A.**

28.    Since June 2016, American Express has furnished information regarding this account to Equifax, Experian and Trans Union, indicating the payment

history, balance, high balance, and other data concerning the account Mr. Baker is an authorized user of.

29.     Mr. Baker has an American Express card issued in his name, and frequently makes purchases with it, and also makes payments on the account.

30.     Experian considers the American Express account to be a form of credit relating to Mr. Baker, even noting that Mr. Baker, born in 1992, has credit history older than he is, noting on his consumer disclosure "The Social Security number that you gave us when you contacted us shows that credit was established before the number was issued."

31.     Mr. Baker is also an authorized user on a Lowes consumer charge card, issued by Synchrony Bank, and has been since the account was opened in July 2022. *Id.*

32.     As with American Express, Mr. Baker has a physical Lowes credit card issued in his name.

33.     Mr. Baker utilizes the card for purchases and makes the payments for the purchases he makes.

34.     The Lowes and American Express accounts are both "revolving" credit lines, e.g., they are open-ended accounts with a credit limit that can be utilized, repaid, and then used again.

35.    Thus, objectively, and empirically, Mr. Baker has two revolving credit lines contained in his report.

36.    Certain versions of FICO® scores pick up on this – Mr. Baker's "mortgage" credit scores – Equifax Beacon 5.0, Experian Model 2, and Trans Union Classic 04 – showed scores of 684, 669, and 678, respectively, based on credit reports obtained from the three CRAs on April 14, 2023. **SEE PLAINTIFF'S EXHIBIT B.**

37.    None of these scores reported that a lack of revolving account or credit card account impacted Mr. Baker's scores, meaning these scoring models viewed Mr. Baker's credit card history as sufficient (or, more specifically, as existing) and did not adversely impact his credit score.

38.    Yet, when Fair Isaac scored Mr. Baker's report using its "Auto Score 10" model – the newest FICO® score customized for the automotive lending industry in 2020 and already widely adopted by it – his Equifax score was 528, well within the "poor" range. **SEE PLAINTIFF'S EXHIBIT C.**

39.    Mr. Baker's second largest key factor was "Lack of recent revolving information," with his fourth key factor "Lack of recent credit card information." ***Id.***

40.    Thus, when Equifax uses Fair Isaac's Beacon 5.0 model, Mr. Baker has credit card history. Yet, when Equifax uses Fair Isaac's Auto Score 10, to analyze

the exact same report, Mr. Baker suddenly has no credit card history at all, resulting in substantially lower scores --- a 156-point difference.

41.    Mr. Baker's Equifax Auto Score 9, which was also calculated from the same April 14, 2023 Equifax data, shows a score of 600 – at the very bottom of the "fair" category. **SEE PLAINTIFF'S EXHIBIT D.**

42.    A "Lack of recent revolving information" was Mr. Baker's second-highest key factor in why his score was not higher, and 84 points below his Beacon 5.0 score, which considered him to have credit card history.

43.    Mr. Baker's Experian Auto 10 score was 539, with his second key factor a "Lack of recent revolving information" and his third a "Lack of recent credit card information."

44.    Mr. Baker's Trans Union Auto 10 score was 582, with his third key factor a "Lack of recent revolving information" and his second a "Lack of recent credit card information."

45.    From January 1, 2023 through September 13, 2023, Mr. Baker diligently searched for an auto loan.

46.    Experian sold at least 10 reports to auto lenders including Ally Financial, Chase Auto, Mid Florida Credit Union, and Ed Morse Cadillac in April and May 2023.

47.     Each of these auto lenders – the end users of the reports – ordered Mr. Baker's FICO® Automotive 9 or FICO® Automotive 10 score, as well as a consumer report from Experian.[1]

48.     Experian, upon receipt of the auto lenders' requests for Mr. Baker's consumer report and FICO® score, ran Mr. Baker's credit information through software licensed to it by Fair Isaac, and then included the resulting FICO® score and key factors in its report to the auto lender.

49.     The FICO® score Experian included on Mr. Baker's reports excluded Mr. Baker's American Express and Lowe's accounts from its computation.

50.     In each of these reports, Experian included the statement "lack of recent revolving information."

51.     Experian also included the Lowes and American Express accounts in each of these reports.

52.     Experian did not provide any explanation or disclosure that the FICO® score provided disregarded authorized user accounts.

53.     As a result, Experian provided consumer reports which falsely indicated a "lack of recent revolving account information," while simultaneously indicating that Mr. Baker had two revolving credit accounts with recent use.

---

[1] The actual credit reports pulled by lenders are often not provided to the consumer by the potential creditor; however, such information is maintained by the end-user and can be obtained by Plaintiff in discovery.

54.    Fair Issac's markets its scores to lenders as being easy-to-use, quick, three-digit distillations of a consumer's credit worthiness and risk of default.

55.    Each report sold with the FICO® 9 or 10 Automotive Score was thus false, or at minimum, materially misleading to Mr. Baker's potential lenders, since the lenders viewed the FICO® score as being representative of Mr. Baker's *entire* report, not just a portion of his report with certain accounts disregarded in full.

56.    Equifax and Trans Union also sold multiple reports to automotive lenders to which Mr. Baker had applied for financing around this same time.

57.    For example, Mr. Baker applied for an auto loan with GM Financial in July 2023.

58.    To evaluate Mr. Baker's application, GM Financial obtained a consumer report with an automotive-enhanced FICO® score from Equifax.

59.    Equifax, upon receipt of GM Financial's request for Mr. Baker's consumer report and FICO® score, ran Mr. Baker's credit information through software licensed to it by Fair Isaac, and then included the resulting FICO® score and key factors in its report to the auto lender.

60.    The FICO® score provided by Fair Isaac to Equifax excluded Mr. Baker's American Express and Lowe's accounts from its computation.

61.    Equifax, in its report to GM Financial, included the statement "lack of recent revolving information."

62.     Equifax also included the Lowes and American Express accounts in its report to GM Financial.

63.     Equifax did not provide any explanation that the FICO® score provided disregarded authorized user accounts.

64.     As a result, Equifax provided a consumer report which falsely indicated a "lack of recent revolving account information," while simultaneously indicating that Mr. Baker had two revolving credit accounts with recent use.

65.     Likewise, Equifax provided a report with a score which reflected analysis of only a portion of Mr. Baker's score, despite Equifax knowing that GM Financial would view the score as representative of Mr. Baker's entire report.

66.     On information and belief, GM Financial's main underwriting criteria was the consumer's FICO score, and this underwriting was predicated on the belief that the consumer's entire credit report was distilled into the three-digit score, not just part of it.

67.     As a result of Equifax and FICO's conduct, Mr. Baker's application for an auto loan was denied. **SEE PLAINTIFF'S EXHIBIT E.**

68.     Equifax sold at least 13 other consumer reports regarding Mr. Baker to prospective auto lenders, from January 1, 2023, through September 13, 2023.

69.     Each of these reports included an automotive-enhanced FICO® score, along with the key factor, "lack of recent revolving account information," as well as the Lowes and American Express tradelines.

70.     Equifax did not indicate or disclose in any of its reports on Mr. Baker that the FICO® score provided disregarded authorized user accounts, or that the score was based only on *some* of the tradelines appearing on the report, but not all.

71.     Each of these reports were thus false, or at minimum, materially misleading to Mr. Baker's lenders.

72.     Trans Union sold 11 consumer reports regarding Mr. Baker from January 1, 2023 through September 13, 2023.

73.     Trans Union, upon receipt of the auto lenders' requests for Mr. Baker's consumer report and FICO® score, ran Mr. Baker's credit information through software licensed to it by Fair Isaac, and then included the resulting FICO® score and key factors in its report to the auto lender.

74.     The FICO® scores Trans Union included on Mr. Baker's reports excluded Mr. Baker's American Express and Lowe's accounts from its computation.

75.     In each of these reports, Trans Union included the statement "lack of recent revolving information."

76.     Trans Union also included the Lowes and American Express accounts in each of these reports.

77.    Trans Union did not provide any explanation that the FICO® score provided disregarded authorized user accounts, or that the score was based only on *some* of the tradelines appearing on the report, but not all.

78.    As a result, Trans Union provided consumer reports which falsely indicated a "lack of recent revolving account information," while simultaneously indicating that Mr. Baker had two revolving credit accounts with recent use.

79.    Each report was thus false, or at minimum, materially misleading to Mr. Baker's potential lenders.

80.    As a result, Mr. Baker was denied financing from each prospective lender.

81.    Revolving credit history – which Fair Isaac deems to include "bank" revolving credit like American Express, Mastercard, and Visa, as well as "non-bank" revolving credit (usually retail credit) such as Lowes, Home Depot, or Macys – makes up roughly 35% of a consumer credit score evaluation.

82.    Thus, the absence of any revolving information of any kind inherently produces a much lower score for almost any consumer, since the 35% of the consumer's score which is based on revolving credit history and usage cannot be evaluated.

83.    Worse, at least in the case of Mr. Baker, is that another 15% of a FICO®
score is based on the length of time accounts have been established, sometimes
referred to as "average age of accounts" ("AAOA").

84.    Fair Isaac designed its Automotive 9 and Automotive 10 scoring
models to disregard authorized user revolving accounts from consideration.

85.    Notably, Fair Isaac does not disclose or otherwise make public the fact
that its Automotive 9 and Automotive 10 scoring models (or any of its other FICO®
9 or FICO® 10 variant scores) disregard authorized user accounts in many
circumstances.

86.    Thus, Fair Isaac's Automotive 9 and Automotive 10 scores are sold to
lenders who presume the scores they are purchasing are reflective of an applicant's
entire credit history, not just part of it.

87.    Fair Issac, as well as the CRAs, could easily include a disclosure noting
that the score did not consider certain tradelines, and list them, but they do not.

88.    The CRA's failure to disclose that something as vital as a consumer's
FICO® score was calculated without the inclusion of decades worth of positive
payment history was unreasonable and in violation of their legal obligation to
maintain procedures designed to ensure maximum possible accuracy of reports sold.

89.    Additionally, the "lack of recent revolving account history" key factor
is *only* generated when a credit report has zero open and active revolving accounts,

or, as in Mr. Baker's case, when the report contains active revolving history but those account(s) are authorized user account(s).

90.     Thus, the false statement was not merely an opinion positing that two active revolving accounts aren't enough – the comment was generated because Fair Isaac's formula did not consider the authorized user accounts, with their decades of positive history, whatsoever.

91.     As a result of Fair Isaac's flawed formulas, decades of history the American Express account had thus also caused Mr. Baker's score to be computed lower, since his AAOA, *sans*-American Express, is much lower than his AAOA when including it.

92.     On information and belief, Fair Isaac frequently excludes authorized user tradelines from its score computations because it inherently assumes that their presence is simply credit "piggybacking" in which the authorized user tradeline is added only for the purpose of inflating a consumer's credit score.

93.     Even if true in certain circumstances, many consumers, like Mr. Baker, have credit reports with authorized user tradelines appearing because they are active users of the account, making charges and payments, often for years.[2]

---

[2] Exclusion of authorized user accounts from credit score computation could potentially run afoul of federal law. The Federal Reserve's Regulation B, which implements the 1974 Equal Credit Opportunity Act, requires information on spousal authorized user accounts be reported to the credit bureaus and considered when lenders evaluate credit history in many circumstances.

94.    Neither Equifax, Experian, nor Trans Union disclosed in their reports to lenders containing Mr. Baker's FICO® Automotive 9 or FICO® Automotive 10 scores that the statement presented as fact in their reports concerning Mr. Baker having no revolving credit history *excluded* authorized user accounts appearing on his report.

95.    Likewise, Fair Isaac does not provide any explanation that these scores exclude authorized user accounts appearing on the report, nor do they list what tradelines were excluded from score calculations.

96.    None of Equifax, Experian, nor Trans Union, for their part, had systems in place to spot the clearly obvious anomalies between the presence of multiple revolving tradelines on a report – actively-reported – and Fair Isaac's statements that "no" revolving credit history existed.

97.    Equifax, Experian, nor Trans Union simply incorporated data generated from Fair Isaac's software, verbatim, without any examination of if the information was true.

98.    The CRAs are required to use reasonable procedures to ensure the maximum possible accuracy of consumer reports.

99.    Failure to flag information which is directly and obviously contradicted by other information *on the same report* is inherently unreasonable.

100.    Fair Isaac designed the formula which resulted in the statement that Mr. Baker's credit score was "poor" due to a lack of recent revolving account history.

101.    Equifax, Experian, nor Trans Union merely included this statement, generated by Fair Isaac, in reports sold regarding Mr. Baker.

102.    Competing credit score models, like Vantage® scores, include the authorized user tradelines appearing on Mr. Baker's reports into their score calculations.

103.    The Defendants' conduct has caused Mr. Baker to suffer severe emotional distress and spend significant time and money forcing the Defendants to comply with their statutory obligations and finding and engaging counsel.

104.    Mr. Baker has also suffered severe embarrassment at having to repeatedly explain himself to lenders when applying for a loan he should have qualified for.

105.    Mr. Baker has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

## COUNT I
## EXPERIAN'S WILLFUL VIOLATIONS OF THE
## FCRA, 15 U.S.C. § 1681e(b)

106.    Mr. Baker adopts and incorporates paragraphs 1 – 105 as if fully stated herein.

107.    Experian violated 15 U.S.C. § 1681e(b) when it failed to follow reasonable procedures to assure maximum possible accuracy of a consumer report, as Experian's procedures resulted in the inclusion of FICO® 9 and FICO® 10 Automotive scores and the comment "lack of recent revolving account information," or similar, on Mr. Baker's reports, without any explanation or other comment explaining that the authorized user accounts were not factored into the scores.

108.    Experian's conduct was willful and intentional, or, alternately, Experian acted with reckless disregard for its duties under the FCRA to ensure the maximum possible accuracy of consumer reports sold.

109.    Experian is thus liable, pursuant to 15 U.S.C. § 1681n, for the greater of Mr. Baker's actual damages and statutory damages of up to $1,000 for *each occurrence*, plus punitive damages, reasonable attorneys' fees and costs.

**WHEREFORE,** Mr. Baker respectfully requests this Honorable Court enter judgment against Experian for:

a.    The greater of Mr. Baker's actual damages and statutory damages of $1,000 per incident, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.    Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681n(a)(3); and,

d.    Such other relief that this Court deems just and proper.

## COUNT II
## EXPERIAN'S NEGLIGENT VIOLATIONS OF THE
## FCRA, 15 U.S.C. § 1681e(b)

### *Pled in the Alternative to Count I*

110.   Mr. Baker adopts and incorporates paragraphs 1 – 105 as if fully stated herein.

111.   Experian violated 15 U.S.C. § 1681e(b) when it failed to follow reasonable procedures to assure maximum possible accuracy of a consumer report, as Experian's procedures resulted in the inclusion of FICO® 9 and FICO® 10 Automotive scores and the comment "lack of recent revolving account information," or similar, on Mr. Baker's reports, without any explanation or other comment explaining the authorized user accounts were not factored into the scores.

112.   Experian owed Mr. Baker a legal duty to utilize reasonable procedures to ensure the accuracy of his consumer reports.

113.   Experian breached this duty when its procedures resulted in the inclusion of FICO® 9 and FICO® 10 Automotive scores and the comment "lack of recent revolving account information," without any explanation or other comment explaining the authorized user accounts were not factored into the scores.

114.   Experian thus acted negligently, and as a result, Experian is liable, pursuant to 15 U.S.C. § 1681o, for Mr. Baker's actual damages, reasonable attorneys' fees and costs.

**WHEREFORE,** Mr. Baker respectfully requests this Honorable Court enter judgment against Experian for:

a.     Mr. Baker's actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.     Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681o(a)(2); and,

c.     Such other relief that this Court deems just and proper.

**COUNT III**
**EQUIFAX'S WILLFUL VIOLATIONS OF THE**
**FCRA, 15 U.S.C. § 1681e(b)**

115.   Mr. Baker adopts and incorporates paragraphs 1 – 105 as if fully stated herein.

116.   Equifax violated 15 U.S.C. § 1681e(b) when it failed to follow reasonable procedures to assure maximum possible accuracy of a consumer report, as Equifax's procedures resulted in the inclusion of FICO® 9 and FICO® 10 Automotive scores and the comment "lack of recent revolving account information," or similar, on Mr. Baker's reports, without any explanation or other comment explaining the authorized user accounts were not factored into the scores.

117.   Equifax's conduct was willful and intentional, or, alternately, Equifax acted with reckless disregard for its duties under the FCRA to ensure the maximum possible accuracy of consumer reports sold.

118.   Equifax is thus liable, pursuant to 15 U.S.C. § 1681n, for the greater of Mr. Baker's actual damages and statutory damages of up to $1,000 for *each occurrence*, plus punitive damages, reasonable attorneys' fees and costs.

**WHEREFORE,** Mr. Baker respectfully requests this Honorable Court enter judgment against Equifax for:

a.   The greater of Mr. Baker's actual damages and statutory damages of $1,000 per incident, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.   Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.   Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681n(a)(3); and,

d.   Such other relief that this Court deems just and proper.

## COUNT IV
## EQUIFAX'S NEGLIGENT VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681e(b)

### *Pled in the Alternative to Count III*

119.   Mr. Baker adopts and incorporates paragraphs 1 – 105 as if fully stated herein.

120.   Equifax violated 15 U.S.C. § 1681e(b) when it failed to follow reasonable procedures to assure maximum possible accuracy of a consumer report, as Equifax's procedures resulted in the inclusion of FICO® 9 and FICO® 10 Automotive scores and the comment "lack of recent revolving account information,"

or similar, on Mr. Baker's reports, without any explanation or other comment explaining the authorized user accounts were not factored into the scores.

121.   Equifax owed Mr. Baker a legal duty to utilize reasonable procedures to ensure the accuracy of his consumer reports.

122.   Equifax breached this duty when its procedures resulted in the inclusion of FICO® 9 and FICO® 10 Automotive scores and the comment "lack of recent revolving account information," or similar, on Mr. Baker's reports, without any explanation or other comment explaining the authorized user accounts were not factored into the scores.

123.   Equifax thus acted negligently, and as a result, Equifax is liable, pursuant to 15 U.S.C. § 1681o, for Mr. Baker's actual damages, reasonable attorneys' fees and costs.

**WHEREFORE,** Mr. Baker respectfully requests this Honorable Court enter judgment against Equifax for:

a.    Mr. Baker's actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681o(a)(2); and,

c.    Such other relief that this Court deems just and proper.

## COUNT V
## <u>TRANS UNION'S WILLFUL VIOLATIONS OF THE</u>
## <u>FCRA, 15 U.S.C. § 1681e(b)</u>

124.   Mr. Baker adopts and incorporates paragraphs 1 – 105 as if fully stated herein.

125.   Trans Union violated 15 U.S.C. § 1681e(b) when it failed to follow reasonable procedures to assure maximum possible accuracy of a consumer report, as Trans Union's procedures resulted in the inclusion of FICO® 9 and FICO® 10 Automotive scores and the comment "lack of recent revolving account information," or similar, on Mr. Baker's reports, without any explanation or other comment explaining the authorized user accounts were not factored into the scores.

126.   Trans Union's conduct was willful and intentional, or, alternately, Trans Union acted with reckless disregard for its duties under the FCRA to ensure the maximum possible accuracy of consumer reports sold.

127.   Trans Union is thus liable, pursuant to 15 U.S.C. § 1681n, for the greater of Mr. Baker's actual damages and statutory damages of up to $1,000 for *each occurrence*, plus punitive damages, reasonable attorneys' fees and costs.

**WHEREFORE,** Mr. Baker respectfully requests this Honorable Court enter judgment against Trans Union for:

a.     The greater of Mr. Baker's actual damages and statutory damages of $1,000 per incident, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.  Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.  Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681n(a)(3); and,

d.  Such other relief that this Court deems just and proper.

## COUNT VI
## TRANS UNION'S NEGLIGENT VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681e(b)

### *Pled in the Alternative to Count V*

128.  Mr. Baker adopts and incorporates paragraphs 1 – 105 as if fully stated herein.

129.  Trans Union violated 15 U.S.C. § 1681e(b) when it failed to follow reasonable procedures to assure maximum possible accuracy of a consumer report, as Trans Union's procedures resulted in the inclusion of FICO® 9 and FICO® 10 Automotive scores and the comment "lack of recent revolving account information," or similar, on Mr. Baker's reports, without any explanation or other comment explaining the authorized user accounts were not factored into the scores.

130.  Trans Union owed Mr. Baker a legal duty to utilize reasonable procedures to assure the accuracy of his consumer reports.

131.  Trans Union breached this duty when its procedures resulted in the inclusion of FICO® 9 and FICO® 10 Automotive scores and the comment "lack of recent revolving account information," or similar, on Mr. Baker's reports, without

any explanation or other comment explaining the authorized user accounts were not factored into the scores.

132. Trans Union thus acted negligently, and as a result, Trans Union is liable, pursuant to 15 U.S.C. § 1681o, for Mr. Baker's actual damages, reasonable attorneys' fees and costs.

**WHEREFORE,** Mr. Baker respectfully requests this Honorable Court enter judgment against Trans Union for:

a.    Mr. Baker's actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681o(a)(2); and,

c.    Such other relief that this Court deems just and proper.

## COUNT VII
## DEFAMATION – FAIR ISAAC

133. Mr. Baker adopts and incorporates paragraphs 1 – 105 as if fully stated herein.

134. Fair Isaac made intentional, false, and defamatory statements about Mr. Baker when it indicated his credit score was "poor" because he had no revolving account history, without providing any disclosure or other explanation that the score and key factors did not factor in authorized user accounts and therefore did not consider the full report.

135.    Fair Isaac's statements and omissions were published and disseminated to each of Experian, Equifax, and Trans Union, who then re-published this information to multiple lenders, and potential lenders, of Mr. Baker's, causing him adverse consequences, including an inability to obtain financing for a car.

136.    Fair Isaac is well aware that the scores and "key factors" generated by its proprietary formulas will be disseminated by Experian, Equifax, and Trans Union – indeed, the whole purpose of Fair Isaac's business is to provide a means of gauging creditworthiness for use by creditors and potential creditors.

137.    Fair Isaac is likewise aware that lenders will often base their evaluation of a potential borrower based on the borrower's FICO score, believing the score is representative of the entire consumer report.

138.    Fair Isaac thus knew that its statements and omissions would affect Mr. Baker's applications for credit and his overall reputation, and it knew the results its software produced would be published in reports generated by Equifax, Experian and Trans Union. Indeed, if its scores were not published by the CRAs, then its software would be essentially worthless.

**WHEREFORE**, Mr. Baker respectfully requests this Honorable Court enter judgment against Fair Isaac for:

a.    Mr. Baker's actual damages;

b.    Such other relief that this Court deems just and proper.

## <u>COUNT VIII</u>
## <u>NEGLIGENCE – FAIR ISAAC</u>

139.    Mr. Baker adopts and incorporates paragraphs 1 – 105 as if fully stated herein.

140.    Fair Isaac is aware that the scores and "key factors" generated by its proprietary formulas will be disseminated by Experian, Equifax, and Trans Union for use by any creditor or potential creditor who orders such a score; indeed, Fair Isaac designs its FICO® scores with this intent.

141.    Fair Issac knows that almost all end users of the reports which contain its FICO® scores presume that the score is representative of all the tradelines on a report, not just a portion of them.

142.    Fair Issac knows that without disclosure that a score is based only on part of a credit report, not all of it, all – or virtually all – of the readers of the report will presume the score to be reflective of the entire report.

143.    Fair Issac has the technological ability to include such a disclosure at little to no cost to Fair Issac, and could easily have done so, but did not.

144.    Fair Isaac has a legal duty to act with reasonable care towards anyone who could foreseeably be harmed by its conduct.

145.    Mr. Baker, a consumer applying for an auto loan, is within this "zone of risk" – as the vast majority of auto lenders request FICO® scores when reviewing a consumer's application for credit.

146.    Moreover, in many circumstances, lenders obtain reports from Equifax, Experian or Trans Union simply to get the FICO® scores, which are not available *sans*-report, and use the FICO® score almost exclusively for its underwriting decision.

147.    Had Fair Issac disclosed its scores were based only on part of Mr. Baker's credit report, and not all of it, Mr. Baker's lenders would have been aware the score excluded significant amounts of data and could have ordered alternative scores, like Vantage®, which evaluates all data in a credit report without omissions.

148.    Fair Isaac breached this duty of care when it designed its FICO® Automotive 9 and 10 scores to exclude authorized user accounts and to generate the comment "lack of recent revolving account information," without any explanation that such accounts were excluded from the score.

149.    As a result of this breach, Mr. Baker's lenders were falsely informed that he lacked recent revolving account activity and denied him credit accordingly.

**WHEREFORE**, Mr. Baker respectfully requests this Honorable Court enter judgment against Fair Isaac for:

a.    Mr. Baker's actual damages;

b.    Such other relief that this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Mr. Baker hereby demands a jury trial on all issues so triable.

Respectfully submitted on April 17, 2024, by:

**SERAPH LEGAL, P.A.**

<u>/s/ *Bryan J. Geiger*</u>
Bryan J. Geiger, Esq.
Florida Bar Number: 119168
BGeiger@seraphlegal.com
2124 W. Kennedy Blvd., Ste. A
Tampa, FL 33606
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

### <u>Exhibit List</u>
A.    Mr. Baker's Experian Disclosure, April 1, 2023, Relevant Excerpts
B.    Mr. Baker's "mortgage" FICO® scores, April 14, 2023
C.    Mr. Baker's FICO® Equifax "Auto Score 10," April 14, 2023
D.    Mr. Baker's FICO® Equifax "Auto Score 9," April 14, 2023
E.    GM Financial Adverse Action Letter, July 30, 2023